**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **EMMANUEL A. KORNYO**<br>**660 Magenta Street**<br>**Bronx, NY 10467**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**GONZAGA COLLEGE HIGH SCHOOL**<br>**19 I Street, NW**<br>**Washington, DC 20001**<br><br>**Defendant.** | **Civil Action No.**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**
**(Race and National Origin Discrimination)**

Pursuant to Federal Rule of Civil Procedure Rule 3, Plaintiff Emmanuel A. Kornyo (hereafter “Plaintiff”), by his undersigned attorney, hereby files his Complaint.

## I. JURISDICTION AND VENUE

1. This Court has original jurisdiction of the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §1343(a)(4), because this is an action arising under the laws of the United States, specifically, the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 (hereinafter “Section 1981”).

2. Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), as Defendant Gonzaga College High School (hereinafter “Defendant”) has extensive and deliberate contacts in this District and Division, including a business location at 19 Eye Street, NW. At all times relevant to this Complaint, Plaintiff worked at Defendant’s business location.

## II. PARTIES

3. Plaintiff is a resident of New York and a former employee of Defendant.

4. Defendant is an educational institution headquartered in Washington, D.C.

## III. FACTS CENTRAL TO PLAINTIFF'S CLAIMS

Background:

**August 18, 2006-2009**

I started work at Gonzaga College High School at the beginning of the Fall Semester 2006 initially as a teacher of Ethics and Philosophy. In 2007, I volunteered as an assistant coach to the freshmen soccer team and also availed myself for retreats, and other ancillary extracurricula activities both on and beyond campus. As the years unfolded, my subject area changed.

**2010: Fr. Conti's harassment intensifies**

In the Fall of 2010, students and faculty had a retreat at Loyola House, Newburg, Maryland. As part of the routine practice, each group of students and their respective faculty supervisors are asked to present a short "skit" of a faculty supervisor of another group chosen at random. Incidentally, students in my group were assigned to make a *skit* about the headmaster (Fr. Conti). Soon after, Fr. Conti confronted me and expressed his displeasure to me even though I had no hand in making the skit about him. Fr. Conti's demeanor changed towards me. I believe this formed one of the basis for the headmaster's retaliatory action towards me thereafter.

It was extremely difficult to make any complaints due partly to my pending immigration status.

**October 2010**

I had discussions about studying towards a biotechnology and a bioethics degrees in anticipation of a new bioethics program at Gonzaga. Fr. Conti gave me the go ahead to apply for the programs with the understanding that Gonzaga will reimburse me with tuition as encapsulated in the Professional Handbook.

Also, at the meeting, we discussed my immigration status and the next steps towards the application for the labor certification and the greencard. Several emails ensured after these initial meetings and my attorney, Ms. Mitchell Dunn, Esq. discussed the processes involved in the next steps of the application process including the legal fees of about $12,000.

**December 1-12, 2010**

I had several meetings and communications with Fr. Conti regarding my acceptance into the MSc in Biotechnology program pending scholarship decisions. Fr. Conti requested for a copy of the admission letter in order to finalize the modalities of reimbursement for tuition in conjunction with the Vice President for Finance, Mr. Jim Rogers. Fr. Conti requested that I submit the actual cost for the program including any scholarships from Georgetown a meeting with him. We also discussed my schedule. On December 6, 2010 at 11:08am I emailed Fr. Conti with the following after a brief meeting.

*>>> Emmanuel Kornyo 12/6/2010 11:08 AM >>>*
*Good morning Father Conti:*

*Peace and joy!*

*I will like to thank you very much for the opportunity to speak with you recently about my prospects for further studies at Georgetown.*

*I have been in contact with the program coordinator and it does appear I did not make it to the prospective scholarship list. The tuition for the programs per credit hour is $ 1, 577. The anticipated credit hours for the*

*entire program is 30. I will leave copies of the admission letter and other ancillary documents with Susan for your perusal.*

*Thank you very much.*

Later in the day, Fr. Conti responded to my surprise after a meeting with the Dean of Studies:
*>>> Vincent Conti, SJ<vconti@gonzaga.org> 12/6/2010 1:25 PM >>>*
*Dear Emmanuel,*

*Many thanks for your email and for all the information you provided. I wanted to get back to you as quickly as possible.*
*Since our conversation last week, I did some research and found out some more definitive information.*
*The faculty benefit regarding graduate school is only applicable to those enrolled in degree programs relevant to their teaching. Since the program you are interested in is not related to your subject matter at Gonzaga, we won't be able to help with tuition.*

*I wish you the best of luck with the degree.*

*Thanks again.*

*Sincerely,*
*Vince Conti, SJ*

I requested for a redress but the Headmaster expressed his reservations about my ability to complete the program even though he knew that I had a valid teaching licentiate in science education from the University of Cape Coast. He also expressed concerns about the "high cost" of the program. The Headmaster made it clear that he was not going to change his mind. It is worth noting that many colleagues from the English Department who studied Philosophy at St. Johns College have their fees subsidized and reimbursed by Gonzaga at the same time. In my case, Fr. Conti initially agreed but discriminatorily refused.

**January, 2011**

My wife developed some medical complications immediately after the birth of our son on December 30, 2010.[1] Upon consultation with physicians and family, it became evident (as of January 11, 2011) that my wife will need an additional care and possibly a surgery. I discussed the complexity of the issues with Fr. Conti and with an administrator for the possibility of an emergency medical/family leave within the context of the Gonzaga Professional Handbook and Federal/DC Laws on January 25, 2011. The Headmaster refused to grant me the permission to care for my wife and our son who was less than a month old. The Headmaster requested that I contact the Vice President for Finance. So I emailed him:

>>> Emmanuel Kornyo 1/25/2011 11:38 AM >>>
Dear Mr. Jim Rogers:

*Good morning!*

*At a meeting this morning with Father Conti and Mr. Mike Howell I did indicate among other things the plausibility of a emergency leave to attend to some family exigency. Typically, I will be in school all week except the last period of each Friday. I will appreciate it if you could offer some clarifications and implications on this matter.*

*Also, I will be very happy to discuss it with you in person.*

[1] I am prepared to give documented medical information when requested

*Thank you very much.*

*Sincerely,*

*Emmanuel*
>>> Jim Rogers<jrogers@gonzaga.org> 1/25/2011 12:09 PM >>>
Emmanuel:

Family/ Medical leave is available with no pay where an extended period of time is needed away from work. This would not apply to the situation as you outlined where partial time is needed every week.

Jim

>>> Emmanuel Kornyo 1/25/2011 11:44 AM >>>
Yes, among other things!

-Emmanuel

>>> Jim Rogers 1/25/2011 11:43 AM >>>
I'm not sure if you are asking if there will be any salary implication? The resolution to this matter lies with the Headmaster in consultation with the President and myself.

Jim

Fr. Conti refused to grant me the permission. When it became evident that I was only requesting for permission in view of the last periods (a total of eight hours) to take care of my son and wife and I was ready to have my salary reduced as suggested, Fr. Conti refused and scornfully threatened to fire me. Axiomatically, Fr. Conti duly granted a short family medical leave to Mr. Hartnett at the same time he refused mine and incidentally, I taught one of his classes until he returned from the leave.

**February, 2011**

On **February 22, 2011** the Academic Dean had instructed and **authorized** Mr. Grant Funary to be responsible for coordinating class coverage. This was because the Dean and the Headmaster were travelling out of campus. On February 23, 2011, I emailed Mr. Grant Funary of my intent to be absent from school (for sixty minutes). I however ensured that the students' test materials during this period were ready for the substitute teacher to proctor so the students will be at par with their colleagues. On ***February 24, 2011 at 10: 58 am,*** Mr. Funary granted me the permission in these words: ***"Noted. We will get them covered for you".*** Mr. Funary also granted permission to at least three colleagues to be absent on the same day.

**March, 2011**

On ***March 3, 2011***, the Headmaster summoned me for an urgent meeting and directed that I truncate teaching or any official duty and meet him immediately at his office. At the office, the Headmaster harshly confronted me about missing school on **February 24, 2011** ***without permission.*** I indicated to the Headmaster that in fact, Mr. Funary excused me officially and shown him the email on my phone and promised to forward it to him as soon I returned to the classroom. I also clarified that my wife was gravely ill and the person taking care of her at the time had to leave hence the excuse. Fr. Conti indicated that the Professional Handbook does not apply to me because he has special rules for me and scornfully suggested that if I cannot, I should be *prepared to go back to the jungle* to my shock. The Headmaster at this time shouted me down and threatened to fire me. He ordered me to leave his office. As I turned to leave, he handed me a *letter of*

*probation* in which he falsely accused me of "dereliction of duty" among other things despite the email evidence from Mr. Funary. What surprised me was that at least three white faculties were also granted permission to be absent **on that same day** but Fr. Conti did not penalize any of them. At that time I had probable cause to believe that the Headmaster willfully discriminated and retaliated against me notwithstanding the emotional distress and humiliation he inflicted on me.

**April-May**

In addition, my wife postponed her surgery as there was no possibility that I will be granted the Emergency Family/Medical Leave to take care of our infant during her post-operational recovery though her health was still not good.

June-August 2011

Extended Medical Leave

Before the summer recess in 2011, I had some communications with Fr. Conti and the Vice President for Finance about the taking an extended Medical Leave (one semester) to cater for my family due to the recurrent nature of my wife's medical issue. I was also obviously getting stressed out from the constant harassment and abuse from the Headmaster so I felt during the medical leave, I could also recover. As a result, I emailed the Headmaster

Dear Headmaster,

I write to inform you of my intent to proceed on family/medical leave this academic year. The leave will enable me attend to some family exigencies. The anticipated leave will be between September 1, 2011 to May, 30 2012.

With every best wish, I remain

Sincerely,

Thank you for your email.

Could you please clarify your intent?

1) Are you asking for leave for an entire year (academic year 2011-2012)? or

2) Do you hope to take the "twelve weeks of unpaid leave in circumstances covered by the Federal Family Medical Leave Act" during the upcoming year (academic year 2011-2012)?

I will be back in touch next week once I have an answer to this question.

Sincerely,
Vince Conti, SJ

Rev. Vincent G. Conti, S.J.
Headmaster
Gonzaga College High School
19 Eye Street, NW
Washington, DC 20001

phone: 202-336-7161
fax: 202-336-7164

>>> Emmanuel Kornyo <ekornyo@gmail.com> 7/22/2011 5:15 AM >>>

**Emmanuel Kornyo ekornyo@gmail.com 7/25/11**
to Vincent

Dear Fr. Conti:
The leave will be between September 1, 2011 to May, 30 2012-nearly the whole academic year.

Thank you.

25 July 2011

Dear Emmanuel,

Thank you for your email today explaining your intended leave from Gonzaga. If I understand correctly, you do not wish to take the kind of leave outlined by the Family Medical Leave Act. Rather, you wish to take a year off from your teaching responsibilities here at Gonzaga.

Unfortunately, at this time, Gonzaga is not able to grant a leave for an entire academic year. We are, however, willing to release you from the terms of your contract for the 2011-2012 academic year so that you can attend to your family exigencies. You would then be welcome to reapply for a teaching position at Gonzaga next year.

Please let me know by the end of the day Wednesday, July 27 if it is your intent to teach at Gonzaga in the fall, or if you would like to be released from the terms of your contract. Since the school year is beginning soon, we need to make plans to fill your position if you do not intend to return.

Sincerely,
Vince Conti, SJ

**Emmanuel Kornyo ekornyo@gmail.com 7/27/2011**

to Stephen, Vincent

Good afternoon Fr.Conti:

Thanks for the e-mail. Per the professional handbook of Gonzaga *"An Employee may opt to take leave for an entire semester or year without pay and return for the next semester or year*". My application for the family leave is within this context.

It is therefore my intent to *take leave for a year without pay and return for the next year.*

Thank you.

**Vincent Conti, SJ** **vconti@gonzaga.org 7/27/2011**
to me

27 July 2011

I will be out of the office until 8 August. I will not have access to email. If you need to speak with someone immediately, please contact Mrs. Stanley-McGrath in the Headmaster's Office (202-336-7161). I will respond as soon as possible.

Thank you,
Fr. Conti, S.J.
25 July 2011
>
> Dear Emmanuel, ****
>
> ** **
>
> Thank you for your email today explaining your intended leave from Gonzaga.
> If I understand correctly, you do not wish to take the kind of leave
> outlined by the Family Medical Leave Act. Rather, you wish to take a year
> off from your teaching responsibilities here at Gonzaga. ****
>
> ** **
>
> Unfortunately, at this time, Gonzaga is not able to grant a leave for an
> entire academic year. We are, however, willing to release you from the
> terms of your contract for the 2011-2012 academic year so that you can
> attend to your family exigencies. You would then be welcome to reapply
> for a teaching position at Gonzaga next year.****
>
> ** **
>
> Please let me know by the end of the day Wednesday, July 27 if it is your
> intent to teach at Gonzaga in the fall, or if you would like to be released
> from the terms of your contract. Since the school year is beginning soon,
> we need to make plans to fill your position if you do not intend to return.
> ****
>

**Rev. Stephen W. Planning, SJ** **<splanning@gonzaga.org>** 7/28/11

to me

Dear Emmanuel:

I understand that Fr. Conti has informed you that he is out of the office for the next week or so. Consequently, I will handle your request from this point. Sorry for the inconvenience, however, Fr. Conti had a death in the family and needed to travel unexpectedly.

Please let me clarify what is found in our Faculty and Staff Handbook to which you refer in your email below. My goal here is to help you understand our leave policy and help you make a proper leave request that will be understood by the school. The paragraph to which you refer states:

"In the case of maternity/family leave, an Employee shall notify the Headmaster or the President at the earliest possible time that he/she will take leave. In conversation with the Employee, the Headmaster or the President will arrange for the most beneficial and equitable leave for both the School and the Employee. An employee may take up to twelve weeks of unpaid leave in circumstances covered by the Federal Family Medical Leave Act. An employee may opt to take leave for an entire semester or year without pay and return for the next semester or year. Since an academic year conforms to a fixed schedule, great care must be taken arranging the terms of maternity/family leave. Communication and early notification are the keys to a satisfactory arrangement."

Our Faculty & Staff Handbook refers to two types of Maternity/Family leave. The first type refers to a qualifying employee's ability to take up to 12 weeks of unpaid leave in circumstances covered by the Federal Family Medical Leave Act (FMLA). The second, not covered by the regulations of the FMLA, allows for the possibility of an employee taking a semester or a year of unpaid leave. This kind of leave is worked out "in conversation with… the Headmaster or the President" since it is not a legal obligation on the part of the school, but rather a benefit offered by the school. We offer the possibility of such leave since an employee might have a reason for family leave not covered by the FMLA, but judged by Gonzaga to be a worthy reason for a leave. The guiding principle for this type of leave is that it will be "beneficial and equitable leave for both the School and the Employee", as stated in the handbook.

In your correspondences with the school to this point, you have not given any explanation for your leave request other than, "to attend to some family exigencies." This is not enough information for the school to be able to respond to your request. "Family exigencies" could refer to anything, and may not qualify you for a leave.

Emmanuel, so that I might understand the nature of your request and make an appropriate determination on this matter, I need you to please give me more information as to the reason for the leave beyond attending to "family exigencies". Then I will be able to determine whether or not you qualify for one of the types of leave referred to in our Handbook.

If you have any questions about what I have written above, please do not hesitate to ask. Otherwise, I look forward to your explanation so that we can move this process forward. May God bless you.

Sincerely,

Fr. Steve Planning, SJ

Rev. Stephen W. Planning, SJ
President
Gonzaga College High School
19 Eye Street, NW
Washington, DC 20001
(202) 336-7171

---

**Emmanuel Kornyo** **<ekornyo@gmail.com>** 7/30/11

to Stephen

*Dear Father Planning:*

*I will like to thank you sincerely for the email. May I also offer my apologies for the delay in responding(I am currently in Ghana and have limited access to the internet).*

*My intent for the leave mainly, is to help my new born child. In addition, my wife is being scheduled for surgery. The initial plan for her surgery should have been this Summer but she lost her dad sadly and has to go to Ghana for the funeral. In the event of the surgery, I will obviously, have to care for both mother and child.*

*I am happy to accept the six months of unpaid leave for the Fall Semester while awaiting your final decision.*

*Thank you very much and I look forward to hearing from you.*

> ** **
>>> Emmanuel Kornyo 07/30/11 8:58 AM >>>

---

**Rev. Stephen W. Planning, SJ** **splanning@gonzaga.org 8/1/2011**
to me

Dear Emmanuel,
Thanks for getting back to me with the reason for your need to take leave. I'm sorry to hear about your wife's medical issues and her father's recent death. I will keep you family in my prayers.
Under these circumstances, the District of Columbia's FMLA law allows you to take 16 weeks of unpaid leave to care for your newborn son and your wife. That is equal to four months. Let me propose the following:

You could start your unpaid leave on August 22nd, the first day that teachers are expected to

report to work after the summer break. Four months of leave would take you up to December 22nd, the first day of Christmas break. This way you are out for the entire first semester. After Christmas break, on January 4th, you could return to work to begin teaching the second semester. During the first semester, in conversation with Fr. Conti, the school can make a decision as to whether or not more leave (beyond FMLA leave) is appropriate for the second semester depending on your circumstances.

Sincerely,

Fr. Planning, SJ

In brief, despite the clarity of the Professional Handbook and the Laws on the Extended Family Leave, the Headmaster was prejudiced and denied me. It was the new President who granted me the leave at the eleventh hour after I made an appeal to him. Obviously, substantial and irreparable harm has been caused as a result of the delays.

**September to December 2011**

I had relative peace and was able to care for my family and the also attended classes at Georgetown. While on leave some colleagues had alerted me that. Conti was trying "get rid" of me from my job. This speculation was confirmed when I returned as the harassment continued.

Father Conti sent a false email to all parents that my son was ill. He also falsely informed faculty and staff that my son was sick and needed "special care" when in fact Fr. Conti officially knew that I went on the leave because my wife was sick. When my attention was drawn to this false information, I immediately alerted Fr. Conti and requested for retraction but he refused. I believe strongly that this was only a way Fr. Conti systematically wanted to humiliate me and my family. It was a painful thing till this day explaining to parents and faculty that my son was NOT ill contrary to what Fr. Conti informed them. I hope that this false information about my minor child will one day be retracted.

**January 2012**

Once school re-opened, I reported for official duties from the one semester unpaid medical leave. I updated the Headmaster on my family's fragile situation and the doctor's recommendation for additional leave but since he was not willing to grant it earlier, I decided not to request for it. However, two weeks into the semester, my wife's health took a down turn. On January 12, 2012 I communicated with the Dean of Studies and the Headmaster that I needed to leave immediately ***after school*** for my son from a care taker and will miss part of the parent teacher conference at 5pm. It should be noted that I did not teach the student in the previous semester, so I was not in the right position to discuss the students' previous exams that night. At a brief meeting, the Headmaster reiterated that the Professional Handbook does not apply to me despite the medical reason for the permission and sternly warned me to be on campus till 8pm. For reason still not disclosed to me, the Headmaster demanded that I notify him personally of any future travel details both within the USA and abroad. Later in the day he wrote: ***"As a result, I cannot grant your request. You have had ample time to make alternative arrangements for transportation for your child. If you are not present this evening, your absence will be considered unexcused"*** (Vincent Conti, SJ 1/12/2012 12:06 PM >>). I had no other choice but left school immediately to pick up my son and a friend took him midway from me back home while I returned to campus for the

evening program. To my surprise at least two colleagues including a faculty from our department were excused on this day for similar reasons.

**February-April 2012**

My wife's medical condition worsened and was hospitalized at Frederick Memorial Hospital and the Seventh Day Adventist Hospital in Takoma Park, Maryland for an extended period of time. It was evident that had the Headmaster granted the one full year of the unpaid medical leave I requested earlier my wife's medical situation would not have deteriorated to that extent. It took the intervention of some faculty for the Headmaster to allow me three days to temporary relocate close to the Frederick Memorial Hospital.

My immigration status was discussed again and there were email communications with my immigration attorney regarding the retainer and the labor certification process. I made a partial payment of $2,9000 to the attorney and Fr. Conti agreed to sign the documentations (labor certification favorably) in view of my earlier conversation in 2010. As a matter of fact, the former President, Fr. Allen Novotny, SJ and the former headmaster Mr. Michael Pakenham confirmed that it was part of my initial employment package to file for the green card for me.

**June-August, 2012(Summer recess)**

IMMIGRATION ISSUES:

When I started work at Gonzaga, it was mutually agreed that my work visa was to be adjusted to permanent status. When Fr. Conti became headmaster, I had a meeting with him and we exchanged nearly fifty emails on the process and he agreed to sign the documents. On the basis of this I paid several thousands of dollars to the attorney but he later manipulated and truncated the process. He manipulated my attorney and later disclose to me in the presence of the dean of faculty and the President that the Attorney was also the schools' lawyer. The President refuted this claim later.

When I realized both Fr. Conti and the attorney became evasive, I had a meeting with Fr. Conti. At the meeting, I respectfully explored every option available to me to Father Conti but he assured me he was going to endorse the labor certification. He then gave me the nod to pay two thousand nine hundred dollars to the attorney. When I mentioned to Fr. Conti that I was the only one caring for my young child and the mother while my wife still recuperating and that the delay of the immigration documents will have serious effects on my family, Fr. Conti only gave me a lethargic response. Later, Fr. Conti chose instead to inform my colleagues about my immigration status and that "he" will be "returning to Africa" and "going back to Nigeria" and have been confronted with chorus of xenophobic and anti-racial sentiments since August 2012. The headmaster had already decided not to sign my immigration documents but never informed me till April 2013 even though he informed colleagues (such as Ms. Tobin) and made me pay $ 2, 900 to the immigration attorney among other expenses.

Vincent Conti, SJ Wed, Oct 31, 2012 at 10:56 AM To: "Emmanuel A. Kornyo"

*Dear Emmanuel, Thank you for your email. I will try to send it by Friday. In the meantime, would you please find out for me when the USCIS will notify you of a decision. I realize your current visa will run out in September, and Gonzaga will need to make plans for hiring someone. Thank you, Vince Conti, SJ Rev. Vincent G. Conti, S.J*

Even though the labor certification was ready at this time, Fr. Conti had refused to sign it and had clearly made up his mind to *hiring someone* to replace me. I had two meetings with him in which we discussed the alternative options to extend my visa/green card but he was not prepared to help. I also suggested the possibility of a Sabbatical since I was due the following academic year. The Headmaster rejected the idea.

From this time onwards, Fr. Conti intensified his campaign to make me a *non-persona-non grata* to the Gonzaga community.

**2013**

*Professional Development*

I have worked very hard to reorganized the Ethics program at Gonzaga and have in particular introduced a new course in Bioethics upon extensive discussion and collaborative research with the departmental head and colleagues. The Headmaster was consistently apprised since Fall 2010. Upon a discussion with Fr. Conti, I applied to Columbia University to study Bioethics (during the summer holidays) as part of professional development. Fr. Conti did not object to it. When I got accepted, I and Fr. Conti had a brief discussion and he suggested I communicate with the new dean of the faculty:

>>> Emmanuel Kornyo 4/11/2013 11:36 AM >>>
Good morning Leslie,

I trust this e-mail finds you well.

I wanted to inform you officially of the acceptance of my admissions to Columbia University, NY to pursue a graduate studies in Bioethics! I have attached a tentative list of relevant courses in view of the classes I teach here in Gonzaga.

I will like to speak with you at your convenience to discuss this further.

With every best wish, I remain,

Sincerely,

Emmanuel
>>> Leslie Keiser 4/12/2013 3:25 PM >>>
Dear Emmanuel,
I wanted to respond to your email about your graduate studies and to continue our conversation about your visa status.

When Fr. Conti and I met with you on March 21,2013 about your visa, you said that you would have an official letter from the proper authorities after our Spring break. We need that official documentation in order to employ you next year. If we do not have this document by April 30,2013, we will not be able to renew your contract for the 2013-2014 academic year.

Congratulations on your acceptance to Columbia University in New York. Unfortunately, Gonzaga will not pay half of your tuition expenses because this course of study was not approved beforehand. The Professional Handbook for Faculty and Staff clearly states:

Members of the Faculty enrolled in graduate programs relevant to their teaching, counseling, or administrative responsibilities, will be reimbursed by the School for one-half of their actual tuition expenses. Such reimbursement will not begin before the completion of a member's second full year of employment at the School. In general it is expected that an employee will remain on the staff at least two (2) years after the completion of a degree which the school has subsidized. All programs of study covered by this benefit must be approved by the Headmaster in advance.

Additionally, Gonzaga would not reimburse you for a degree in Bioethics based on lack of relevance to your teaching. Bioethics is too narrow a field of study for the general ethics course we offer on the high school level.

Please arrange a meeting time with Fr. Conti and me if you have any further questions.

Sincerely,

Leslie Keiser

Dean of Faculty

**Emmanuel A. Kornyo <ekornyo@gmail.com>** 4/15/13

to lkeiser, Vincent, Stephen, aturner

Dear Leslie,
Good afternoon and thank you for your earlier email this morning. Please disregard my first email to you-I inadvertently sent the email.

The anticipated Bioethics program actually has a direct relevance to the current ethics I teach here in Gonzaga.

For several years now, I have thoughts about bringing to date some of the issues discussed in the second semester ethics course to reflect the changing trends in ethics. In this course, we have delved into the nexus of many ethical issues that are in reality Bioethics by nature. Indeed, the course title "Issues in Ethics" encapsulate this fact. Over the years, the conversation has been resurging about the changing trend and the new trajectories in Ethics. The second semester textbook has been of a major concern as we have been changing the content of the book for the second semester course.

Four years ago, some conversations began about the textbook and the course content again. From this initial conversations, it became increasingly, evident that what we have been teaching in the second semester is in reality applied ethics and more specifically bioethics.

In addition, Gonzaga retained the Ethics course since it reflected the objectives of the new curricula for religious education. In line with this, the conversation continued in the department and so during the early part of the first semester, the syllabus for the *Issues in Ethics* was redesigned to reflect this changing trajectory. A meticulous view of the attached syllabi suggests some minor changes. Also, since most of the articles in the previous textbook (that I have edited) were becoming increasingly obsolete, a new textbook was proposed. After all the teachers of Ethics had the chance to review the book, the head of the department confirmed that the book will be used next year. Hence the old textbook will be reduced significantly and posted on the web for students to download as a supplementary material.

In view of the above, the anticipated studies at Columbia University significantly have correlations with the current Ethics and Bioethics/Issues in Ethics course. The anticipated core courses will refresh and deepened my knowledge in ethics in general. The electives have both virtue based ethics reflective of Catholic moral theology and the bioethics piece. I have also attached a tentative list of classes that directly relates to the two courses in Ethics that I teach here in Gonzaga.

The initial email to you was only informational and I did intend following up to confirm my acceptance into the program and discuss details of the course work with you prior to meeting the Headmaster for approval. In view of the above, I will like to schedule a meeting with you to discuss this further prior to meeting the Headmaster on this.
With every best wish, I remain

**Emmanuel A. Kornyo** ekornyo@gmail.com 4/15/13

The dean discussed the admission with Fr. Conti. It was a big shock to me when the dean in consonant with Fr. Conti informed me among other things that:
*Additionally, Gonzaga would not reimburse you for a degree in Bioethics based on lack of relevance to your teaching. Bioethics is too narrow a field of study for the general ethics course we offer on the high school level.*
It was evident that the basis for refusing to reimburse me was discriminatory. Even though it was evident that the intended program in Bioethics at Columbia University was **directly relevant** to my professional work and the courses I was teaching at Gonzaga, again Fr. Conti found a way (through the dean) to suggest otherwise. Today, Gonzaga has fully adopted the new Bioethics course I designed and proposed including the textbook I recommended.
Also, it was common knowledge that I discussed my intent to apply into the bioethics program with the Headmaster and he gave me the go ahead before Ms. Keiser was made Dean of the Faculty. As a result the Headmaster specifically asked me to submit the specific courses I was going to study to the Dean of the Faculty for approval for tuition reimbursement.
At the same time, a Gonzaga staff member at the Development Office who was studying Cross-Cultural Counseling during the summer at Trinity University whose undergraduate degrees was not counseling. His tuition was subsidized by Gonzaga at the same time that mine was rejected.
Fr. Conti and the dean sent the head of the department to forcefully grab the exams papers in the presence of some students in my Ethics class, even though I provided all information he requested for. I have never heard that any colleagues' exams papers received the same unjustified scrutiny nor were any force used to grab anything from them. I made an official complaint to the Dean of the Faculty about the physical harassment, but the dean only responded that "you were vindicated". Till this day, no official explanation has been offered for the use of physical force on me in the class room in the presence of the students.
March 21, 2013
I met the Dean of the Faculty and the Headmaster regarding my visa status. I explained that I was waiting for the headmaster to sign the labor certification even though I submitted the green card applications. I also had the chance to meet with the President and the Vice President of Finance and the Headmaster. It was evident that the Headmaster's refusal to sign the labor certification in the previous year (2012) was putting my immigration status in jeopardy. The President requested me to present my work visa within two weeks. I explained the procedure and pleaded that if the

labor certification is signed, I could request for premium processing. Soon after the meeting, I retained another immigration attorney who determined that if the headmaster did not sign the labor certification, my green card application may not go through. In essence, the delay for not signing the labor certification has already jeopardized my immigration status. He recommended that since I had a valid H-1B visa until September 22, 2013, the headmaster/Gonzaga could request for a six month extension while the labor certification was addressed. But the headmaster did not budge. At the graduation ceremony in ***on June 2, 2013*** which was supposed to be a happy day for all us at Gonzaga turned into another painful day for me. Soon after the ceremony, I returned to the JDR to return my faculty graduation robe as all faculty and staff were required to do. As soon as Fr. Conti saw me, he shouted on me asking me what I wanted there. To my chagrin, Fr. Conti used the N* word on me. I did not utter a word but walked out. I am sure the CCTV there could confirm this incidence

CONCLUSION

Fr. Conti prejudicially and systematically profiled, and maligned me for three years (2010-2013) and precluded me from any *fair equal opportunity* and *formal equal opportunity* at my job at Gonzaga ostensibly due to my race, country of origin and immigration status among other things. Even though the headmaster had the fiduciary and canonical obligation to ensure that all workers were treated fairly, but selectively rendered my presence at Gonzaga *a non-persona non grata* and undermined every effort in the performance of my duties as a teacher. It was impossible to make any official complaint due to my immigration status and the fact that he was my immediate supervisor. (I gathered courage to make some complaints to the President of the school but it did not change the trajectory of the abuse).

## IV. STATEMENT OF CLAIMS

### Count I: Violation of Section 1981 (National Origin Discrimination)

5. Plaintiff adopts and incorporates by reference ¶¶ 1-__ above.

6. Plaintiff adopts and incorporates by reference paragraphs 1-36 above as if fully set forth herein.

7. Title 42 U.S.C. § 1981 provides, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

8. Section 1981 makes it unlawful for an employer to discriminate in employment on the basis of national origin.

9. Plaintiff, as an African is a member of a protected class under § 1981, and thus had the clearly established statutory right under this provisions of § 1981 to be free from national origin motivated discrimination at work.

10. Defendant's conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law in violation of §1981.

11. As a result of Defendant's violations of Section 1981, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

**Count II: Violation of Section 1981 (Race Discrimination)**

12. Plaintiff adopts and incorporates by reference ¶¶ 1-__ above.

13. Plaintiff adopts and incorporates by reference paragraphs 1-36 above as if fully set forth herein.

14. Title 42 U.S.C. § 1981 provides, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

15. Section 1981 makes it unlawful for an employer to discriminate in employment on the

basis of race.

16. Plaintiff, who is black, is a member of a protected class under § 1981, and thus had the clearly established statutory right under this provisions of § 1981 to be free from race motivated discrimination at work.

17. Defendant's conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law in violation of §1981.

18. As a result of Defendant's violations of Section 1981, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

**Count III: Violation of Section 1981 (Retaliation)**

19. Plaintiff adopts and incorporates by reference paragraphs 1-__ above as if fully set forth herein.

20. Title 42 U.S.C. § 1981 prohibits retaliatory behavior on behalf of an employer when an employee reports a violation of § 1981.

21. As a result of Defendant's retaliation, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## V. REMEDIES SOUGHT

22. WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting her the following relief from Defendant:

a. A declaratory judgment that Defendant discriminated against Plaintiff, as alleged herein;

b. Back pay, including without limitation other lost benefits due to Defendant's discrimination against Plaintiff;

c. Compensatory and punitive damages, pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(3)(A), for taking these actions with malice and bad faith;

d. Prejudgment and post judgment interest on all damages, on the lost compensation and compensatory damages;

e. Reasonable attorneys' fees and costs 42 U.S.C. §§ 1981a, 2000e-5(k); and

f. Such other and further relief as to the Court seems just and warranted.

## VI. JURY TRIAL DEMAND

23. Plaintiff requests a jury trial on all issues of fact and damages arising herein.

Respectfully submitted,

*Edgar Ndjatou*

EDGAR NDJATOU
McCree Ndjatou, PLLC
1828 L Street, NW, Suite 600
Washington, DC 20036
T: (202) 290-3724
F: (202) 370-7173
endjatou@mnlawyerspllc.com
*Attorney for Plaintiff*